## WILLIAMS *v.* THE STATE.

Even if the request to charge embodied a sound legal principle, it was not applicable to the facts. The instructions excepted to were pertinent and were not calculated to mislead the jury. The jury are the sole judges as to "cooling time." The verdict was strongly supported by the evidence, and the court did not err in refusing a new trial.

Argued March 16,—Decided March 27, 1908.

Indictment for murder. Before Judge Worrill. Miller superior court. January 24, 1908.

Sonnie Williams was convicted of murder, for the killing of Almond Ward, and his motion for a new trial being overruled, he excepted. Both the accused and the deceased were negro convicts, confined in a prison stockade at the time of the homicide. They had an angry altercation a day or two prior to the homicide, over the taking by the accused of a watermelon belonging to the deceased, without paying for it. Only two of the State's witnesses testified that they saw the beginning of the fight. One of them, Mit Hammond, testified: "The first thing I saw was Sonnie Williams walk up to Almond Ward and said to him, 'This makes the second time that you have crossed my path;' and Almond . . said, 'Sonnie, you have been running over me long enough, I am not scared of you:' and then Sonnie said, 'If nothing will do you but death, why' he would pay him off. . . Almond Ward told him, 'Let's go away from here;' and when he said that, Sonnie had reached his hand down in here [indicating on the right-hand side of the waistband of his pants, inside], and Almond had his knife open in his hand, but I did not see Sonnie's knife at the time; and when he said 'Let's go away from here,' Sonnie pulled out

his knife from down in here, and they both started to cutting about the same time." The other of these witnesses, Willis Greer, testified: "When I saw it, I was sitting down about four feet from them. Sonnie Williams walked down to Almond Ward's box, and Sonnie said that 'this is the second time that you have got in my path, and if you get in my path again, I am going to knock you out;' and Almond Ward said, 'You have run over me long enough,' and he had his knife in his hand, this way; and as soon as he said that, Sonnie Williams run his hand down this way, and jerked out his knife and struck him the first time; and when Sonnie Williams struck him the second time, he (Almond) broke and run." Several other witnesses testified that they saw the fight after it began, and all who saw any of it testified, that after Sonnie had cut Almond, the latter ran, pursued by Sonnie with open knife; that in dodging. around a post, Almond ran against a bench and fell, when Sonnie jumped on him and cut his throat, nearly severing his head from his body. Almond, while running, was bleeding freely from the cut or cuts inflicted by Sonnie. The distance Almond ran before falling was variously estimated at from twenty to thirty steps to fifty yards. No one saw any weapon in Almond's hand while he was being pursued by Sonnie. After the killing, a knife was found a few feet from where the fight began. One witness testified that "when Almond Ward fell over the bench, he fell on his back, and Sonnie Williams jumped on him and put his knee in his breast, and put his left hand on Almond's head and shoved it back and cut his throat." And another testified, that "while Sonnie was doing the cutting he was on top of him, and he said, 'This makes the second time I have done something to you, but I am going to cut your neck off now;' and he went to talking and went to cutting again." After killing Almond, Sonnie washed his knife and handed it to Captain Sims, and when asked by Sims, "how come him to do this?" Sonnie said that he "wanted to kill the son of a bitch."

No witness was called by the accused, but he made the following statement: "The first thing that we got in a fuss about was a watermelon I took from him in the mill yard. I got the watermelon all right, and told him that I would pay him for it. We had a little scrummage in the mill yard, he made a break at me cudgel and grabbed up the scantling, and Mr. Womack stopped us;

26

he went one-way and I went another. That was on Friday, and Saturday I went to work and come back Saturday evening and washed in the bath-house, and he started at me again, but I didn't say anything to him. During Sunday morning he called to me and said to me, 'Come here.' I went to him and he said, 'I want an understanding about what you said to Mr. Womack, and I want pay for my watermelon;' and he said, 'If you don't pay me, there is going to be hell to pay;' and I said, 'all right,' and he grabbed up a shovel and attempted to hit me, and I walked off and sat down. After a while I was walking across the yard and he hailed me again, and I went to where he was and I said, 'Well, this makes twice you have crossed my path, and if nothing but death between you and me will suit you, it's all right;' and me and him started. We started about the same time, but when he saw I was getting the best of him, he turned to run, and he run up against one of the boxes, and I was right behind him, and he wheeled and went around a post, and I cut him while standing up, and he wheeled around and fell, and I didn't cut him any more, and I walked off."

*W. I. Geer,* by *Z. D. Harrison,* for plaintiff in error.

*John C. Hart, attorney-general, J. A. Laing, solicitor-general, R. R. Arnold,* and *J. B. Ridley,* contra.

FISH, C. J. (After stating the facts.)

1. Complaint was made in the motion for a new trial of the refusal of the court to instruct the jury, as requested in writing by the accused, as follows: "A man may repel force by force, in defense of his person against any one who manifestly intends and endeavors by violence or surprise to commit a known felony on him. In such a case the defendant is not compelled to retreat, but may pursue his adversary until he finds himself out of danger, and if, in the conflict between them, he happens to kill him, such killing is justifiable." The errors assigned were: "(*a*) The evidence in the case showed that there was a mutual intention to fight on the part of the defendant and the deceased, and great heat of blood. (*b*) The evidence for the State showed that the deceased had his knife open and in his hand before the defendant ever drew his." The most favorable view of the evidence for the accused is that there was a sudden quarrel, and drawing of deadly weapons by both parties, with a mutual intent to fight, when the difficulty

began. According to the evidence, however, as will be seen from the statement of facts, the deceased quit fighting and ran away, unarmed, evidently declining any further struggle, and the accused pursued him with an open knife, and when he fell, either from the effects of stabs already inflicted upon him by the accused or by reason of running against a bench, or from both these causes, the accused jumped on him, and in a most brutal and shocking manner almost severed his head from his body. The accused said in his statement: "We started about the same time, but when he saw I was getting the best of him, he turned to run, and he run up against one of the boxes, and I was right behind him, and he wheeled and went around a post, and I cut him while standing up, and he wheeled around and fell, and I didn't cut him any more, and I walked off." Even if the proposition, that one of the participants in a mutual combat (as the first assignment of error designates the struggle in this case) "may pursue his adversary until he finds himself out of danger, and if, in the conflict between them, he happens to kill him, such killing is justifiable," may be, under any circumstances, legally sound, such a proposition was not applicable to the facts of this case.

2. Another contention was, that the court erred in charging as follows: "If you believe, from the testimony, that at the time the defendant approached the deceased, if the evidence showed that he approached him, he had formed the intention of killing the deceased, and that defendant's purpose in approaching him was to provoke the deceased to attack him for the purpose of killing the deceased, and if you should further believe that under such circumstances the defendant provoked the deceased to resist him, or if he attacked him in a way that made it necessary for the deceased to resist him, then, under such conditions, the killing would be murder." The only exceptions to this charge, referred to by counsel for the plaintiff in error in their brief, are "that the evidence did not authorize the charge; it was too strongly against the defendant, and suggested a deliberateness of purpose on the part of the defendant that did not appear from the evidence." These exceptions are, we think, without merit, as the evidence fully warranted the charge.

3. There were also exceptions to the following charge: "If you believe that at the time the first blow was inflicted by the de-

fendant upon the deceased, if the evidence shows that any blows were inflicted by the defendant upon the deceased, there existed a mutual intention to fight, and if you should further believe that was not a fatal blow, but that after inflicting such first wound the deceased retired from the combat and fled, and if you should believe that the defendant pursued him, and, after pursuing him, overtook him, and then inflicted the fatal wound which caused his death, and if you should further find that sufficient time had elapsed for him to cool and for the voice of humanity to be heard and for reason to resume its sway, then, under such conditions, the killing would be murder." As to this instruction counsel for plaintiff in error, in their brief, make reference only to the following contentions: (1) "This charge is not applicable to the facts as proven. No witness testified that the deceased retreated after the first wound was inflicted. On the contrary, the only two witnesses who saw the fight from the beginning to its end were Hammond and Greer. Hammond testified that three wounds were inflicted on deceased before he fled, and Greer testified there were two such wounds. Both of these witnesses testified that from one of these wounds in the neck a stream of blood 'spurted' upward, falling all around them. It is probable, if not evident, that this was a fatal wound, and it is certain that there was no 'cooling' time between the beginning of the fight and the time when this wound was inflicted. (2) This charge was misleading, and withdrew from the consideration of the jury the effect of the wounds inflicted before the flight of the deceased. If a fatal blow was given before the flight of the deceased began, what happened thereafter, revealing the brutal nature of defendant, should not be considered, to determine the measure of his guilt. If no fatal blow was given before the flight began, the pursuit being immediate and of short duration, there was no interval for cooling, or for the subsidence of passion more brutal than human." If this charge does not correctly state the law, it is because of this phrase therein, "and if you should further believe that this was not a fatal blow." This, however, was in favor of the accused; for even if the deceased retired from the mutual combat mortally wounded, the accused had no more right to pursue him and instantly take his life than if he had been only slightly wounded or indeed had not been wounded at all. But the correctness of the instruction, in the abstract, is

not questioned, but only its applicability to the facts of the case is brought in question. The hypothesis in the charge, that if the deceased retired from the combat and fled, after the accused, during a mutual combat, had inflicted "such first wound upon him," etc., if not accurate, for the reason that the evidence showed that the deceased was cut in two or three places before he fled, was, nevertheless, not harmful to the accused, as the inaccuracy did not in any way affect the correctness of the legal proposition the court was stating to the jury. As to this question; the mere number of wounds which the accused inflicted upon the deceased, before the latter abandoned the combat and fled, was utterly immaterial. If the parties engaged in a mutual combat and, while so engaged, the accused wounded the deceased, and he abandoned the conflict and fled, and the accused pursued and overtook him, and then inflicted the wound which caused his death, and sufficient time had then elapsed after the mutual combat for the voice of reason and humanity to be heard, the killing was murder, whether one or many wounds had been inflicted upon the deceased before he turned his back upon his adversary and fled for his life.

We do not see how the charge was calculated to mislead the jury, by withdrawing from their consideration the effect of the wounds inflicted before the flight of the deceased. Counsel contend that "if a fatal blow was given before the flight of the deceased began, what happened thereafter, revealing the brutal nature of the defendant, should not be considered to determine the nature of his guilt." The State evidently relied for a conviction of murder upon the evidence of the witnesses who testified, that the deceased quit the fight, after he had been wounded, and fled, unarmed; that he was pursued by the accused, with an open knife, for a distance of between twenty and fifty yards; that in endeavoring to escape from his pursuer, the deceased dodged around a post and fell to the ground, on his back, and that the accused jumped on him and almost cut his head from his body, killing him instantly. For thus instantly killing the deceased, the accused was convicted of murder. There was no evidence that the death of the deceased was caused by the wounds, or either of them, that he received before he fled. Even if there had been evidence that he would have died from such wounds, or either of them, the accused, as we have already intimated, was guilty of murder, if he subse-

quently, unlawfully, took the life of the deceased with malice afore-thought. Whether or not there was sufficient "cooling time," in the interval between the beginning of the flight of the deceased and when he fell and was killed by the accused, was a question solely for the jury to determine, as, under the act approved December 19, 1899 (Acts 1899, p. 41), "The killing [to be voluntary manslaughter] must be the result of that sudden, violent impulse of passion supposed to be irresistible; for if there should have been an interval between the assault or provocation given and the homicide, of which the jury in all cases shall be the judges, sufficient for the voice of reason and humanity to be heard, the killing shall be attributed to deliberate revenge, and be punished as murder."

4. The verdict was authorized by the evidence, and the court did not err in refusing a new trial.

*Judgment affirmed.   All the Justices concur.*