## MILLER *v.* THE STATE.

1. Newly discovered evidence which is impeaching and cumulative in character is not generally cause for a new trial. In this case there was no abuse of discretion in refusing to grant a new trial because of newly discovered evidence.
2. Where a juror is kin both to the prosecutor and the defendant within the prohibited degrees of relationship, and this fact is known to the defendant and he makes no objection until after conviction, he will be presumed to have waived the incompetency of the juror.
3. The fact that a sister of a juror married the brother of the prosecutor's wife establishes no relationship between the prosecutor and the juror, and the latter is not incompetent to serve as a juror on the trial of one charged with the murder of the prosecutor's child.
4. It is not error to fail to instruct the jury on the law of justifiable homicide, and of voluntary manslaughter, where the evidence does not authorize it.

APRIL 17, 1913.

Indictment for murder.    Before Judge Freeman.    Heard superior court.    January 29, 1913.

*S. Holderness; W. C. Wright, W. Smith,* and *A. J. Andrews,* for plaintiff in error.

*T. S. Felder,* attorney-general, *J. R. Terrell,* solicitor-general, *F. S. Loftin,* and *H. A. Hall,* contra.

HILL, J. John Daniel and Lou Miller were jointly indicted for the crime of murder. Daniel was never tried, having fled from the State and died without being arrested. Miller was put upon trial as a principal in the second degree, convicted, and sentenced to life imprisonment in the penitentiary. He made a motion for a new trial, which was overruled, and he excepted. The evidence for the State tended to show, that, a few hours previous to the homicide, Daniel and the prosecutor, D. E. (Doc) Bell, had a difficulty in the presence of the defendant, who was in the buggy with Daniel, and who had without legal provocation shot at Bell, and Bell, later arming himself, returned the fire after Daniel had again fired first at Bell. Daniel and the defendant retired from

the scene of the first rencounter, and the defendant procured a Winchester rifle from a neighbor, and soon thereafter Daniel, with a Winchester rifle, in company with the defendant went to Bell's home, where his family was, and a general fusillade occurred, Daniel shooting from behind a stump, and, according to eye-witnesses, firing first at Bell, who was on or near his front porch when the shooting began, and who later retreated to a storehouse near his dwelling, from where he and his brother's friends returned the fire with shotguns and a parlor-rifle. During this shooting the defendant was standing near Daniel and saying, "Shoot! Shoot!" In his statement the defendant denied this, and said that what he did say was, "Don't shoot." A Winchester-rifle ball entered the dwelling-house of Bell from the direction Daniel was standing, and killed an infant child of Doc Bell in one of the rooms. After the shooting both Daniel and the defendant left the scene of the homicide together and fled from the State.

1. The first, second, third, and fourth special grounds of the motion ask for a new trial because of newly discovered evidence. Most of this evidence tends to impeach the State's witness McBrayer, who testified on the trial that, as he passed the scene of the difficulty, the defendant was standing near Daniel, who did the shooting, and said to the latter, "Shoot!" The affidavits of these newly discovered witnesses tend to show that McBrayer, prior to giving his testimony, said to the affiants that he understood the defendant, Lou Miller, to say to John Daniel, "Shoot!" but he could not be positive; that he might have said, "Don't shoot;" that his mule was frightened and he was watching his mule instead of Miller. In a counter-affidavit McBrayer denies the language attributed to him by all the alleged newly discovered witnesses, and says that what he did say to these witnesses was the same as his testimony given on the trial of the case, which was that he heard the defendant, Lou Miller, say to John Daniel, "Shoot!" and that he did not hear him say, "Don't shoot." Two other newly discovered witnesses gave affidavits to the effect that on the afternoon of the homicide they saw John Daniel, who had on his shoulder a Winchester rifle at the time. Daniel gave affiants the first information they had of the difficulty at Bell's.

The judge did not abuse his discretion in refusing a new trial upon the ground of this newly discovered evidence. This evidence

was impeaching and cumulative in its character, and "It is well settled that alleged newly discovered evidence of this character is not generally cause for a new trial, even where it is uncontradicted; and it is perfectly clear that where it is contradicted by evidence introduced by the State on the hearing of the motion, there is no abuse of discretion in refusing to grant a new trial upon the ground of the existence of such evidence and its discovery since the rendition of the verdict." *Washington* v. *State,* 124 *Ga.* 423, 431 (52 S. E. 910); *Burge* v. *State,* 133 *Ga.* 431 (66 S. E. 243); *Wimms* v. *State,* 135 *Ga.* 659 (70 S. E. 254).

2. The fifth ground of the motion assigns error because Joe Bagwell, a juror who was impaneled and sworn, and who did try the defendant, was related to D. E. (Doc) Bell and to the deceased, the latter being the infant daughter of the prosecutor. It is insisted that the juror is a second cousin by marriage to the prosecutor and a third cousin to the deceased, and is therefore within the prohibited degrees of relationship. The affidavit to support this ground tends to show that "Bagwell married a Barber, which said Miss Barber was a daughter of Bud (L. E.) Barber; said Bud Barber married a Miss Mathis, and said Miss Mathis was a first cousin to John Bell—Doc Bell; the prosecutor in said case is a son of John Bell." From this affidavit it appears that Bagwell, the juror, is the husband of the third cousin of the prosecutor. In other words, the juror married the prosecutor's third cousin. This would bring the juror within the prohibited degree, and as a general rule would disqualify him, and would be cause for a new trial if he served on the jury which convicted the defendant, without knowledge on the part of the defendant or his counsel of the relationship at the time of his acceptance and service as a trial juror. But the State introduced, on the hearing of the motion for a new trial, a counter-affidavit of L. E. Barber, who testified that he was "the father of Lola Bagwell, the wife of Joe Bagwell; that deponent married Emma Mathews; that Matilda Mathews was the daughter of Mrs. Brown; that Mrs. Brown was the sister of John Cheek and also the sister of Mrs. Luke Bell, who was the grandmother of Lou Miller and D. E. Bell, the prosecutor; that Lou Miller [the defendant] always called deponent "Cousin Bud," and called my wife cousin; that said Miller has visited deponent's family; that Mrs. Luke Bell was the grandmother of said

Lou Miller and said D. E. Bell." It appears, therefore, that the defendant and the prosecutor had a common ancestor in Mrs. Luke Bell, the grandmother, and consequently are first cousins. We think the evidence sufficiently indicates, if it does not absolutely show, that the defendant knew of the relationship existing between the juror and the prosecutor. He did know of the relationship between the juror and himself, and it is inconceivable that he did not know the relationship existing between all three. He lived in the neighborhood, was a first cousin of the prosecutor (as testified by the latter), and he called the juror's father-in-law "Cousin Bud," The prosecutor testified that the defendant "was nearly double a first cousin to me; he was a first cousin; then he was a second cousin." If the juror was related to the prosecutor within the prohibited degree, he was also related to the defendant within the prohibited degree. This relationship must have been known to the defendant, because he always addressed the juror's father-in-law as "Cousin Bud," and his wife as cousin. It is well settled that where a juror is known to be incompetent, such incompetency is presumed to be waived unless objection is made. *Georgia R. Co.* v. *Cole,* 73 *Ga.* 713 (2 *b*); *Lampkin* v. *State,* 87 *Ga.* 516 (7), 517 (13 S. E. 523); *Hadden* v. *Thompson,* 118 *Ga.* 207 (2), 208 (44 S. E. 1001).

3. The sixth ground of the motion assigns error because of the alleged relationship of one of the jurors, Jim Boggus, to Mrs. D. E. Bell, the wife of the prosecutor, and mother of the child killed, within the prohibited degrees. The affidavit of L. R. Jones, introduced by the defendant at the hearing of the motion, tends to show that Boggus, the juror, is a brother-in-law of Jim Jones, in that the latter married a sister of Boggus, and Jones is a brother of Mrs. D. E. Bell, the wife of the prosecutor, and the mother of the child killed. In other words, the juror is a brother-in-law of Jim Jones, who is also a brother-in-law of the prosecutor, Doc Bell. Neither is there any relationship between the juror and the mother of the child by reason of the fact that she was the sister of Jones who married the juror's sister. This does not disqualify the juror. It comes within the ruling made in the case of *Burns* v. *State,* 89 *Ga.* 527. It was there held that "Marriage relates the husband to the wife's kindred, but does not relate any of his kindred to hers. Consequently, a man whose brother had married the prisoner's sister was not, for that reason, incompetent as a juror to try the

prisoner for an offense." And see *City of Dalton* v. *Humphries,* 139 *Ga.* 556 (77 S. E. 790).

4. Error is assigned on the failure of the court to charge the law of justifiable homicide, or of voluntary manslaughter, as applied to John Daniel, the alleged principal in the first degree. It is insisted that inasmuch as the State contended that John Daniel was the actual perpetrator of the crime, and that the defendant Miller was present aiding and abetting the same to be done, the failure of the court to charge the law of justifiable homicide and make such instructions applicable, to John Daniel was error and prejudicial to the defendant, for the reason that the burden was on the State, under the law, to show that the principal was. guilty of murder, . before the State could ask a conviction of the movant, who was the alleged principal in the second degree, and before the jury could convict him they must believe beyond 'a reasonable doubt that Daniel was guilty' of murder. Under the evidence in this case, we do not think that either the law of justifiable homicide or that of voluntary manslaughter is applicable. The evidence for the State tended to show that after the first difficulty between John Daniel and the prosecutor, the latter went to his home; and that Daniel and the defendant went away together. The defendant procured a Winchester rifle from a neighbor, for the purpose, he said, of killing a hawk, and in a very short time he and Daniel appeared at the home of the prosecutor, Daniel having a Winchester rifle. Soon after lending the rifle the neighbor said to J. D. O'Keefe, a witness for the State, that "when that old rifle began to crack, he said he knew *that* was his gun then." The evidence tended to show that Daniel commenced to fire at the prosecutor from behind a stump, while the latter was endeavoring to get him to leave, and continued to shoot at least sixteen times— twice after the mother had brought the dead baby out on the porch in her arms and told Daniel that he had killed her. One of the bullets from the Winchester rifle went through a portion of the house and killed the infant child of the prosecutor while lying in its bed. While the shooting was in progress a minister of the gospel was driving along the public road opposite to where the shooting was, and saw a man there holding a horse, and understood the man to say to another man also standing. there, "Shoot!" and the man immediately shot.. Other witnesses identified the man

holding the horse as the defendant, Lou Miller, and the man at the stump with the rifle as John Daniel. Mrs. Effie Johnson and Nonie Bell were pleading with John Daniel not to go back to Doc Bell's. Daniel was cursing Doc Bell, and said he was going to kill him. Before Daniel said this of Bell, Miller said, "John can't take everything." It seems clear from the evidence that John Daniel went to the house of the prosecutor for the purpose of killing him, and that the defendant was there aiding and abetting him. Had Daniel killed the prosecutor, we think there is no question that he would have been guilty of murder, and the defendant, who aided and abetted the act, would have been none the less guilty. And if under such circumstances the shot or shots fired by Daniel at the prosecutor missed him, but hit his child and killed her, both Daniel and Miller would be guilty of murder. 1 Bishop's Crim. Law (8th ed.), § 328; 1 Wharton's Crim. Law (11th ed.), 695; 21 Cyc. 694. We can see no element of justifiable homicide in this case, but, on the contrary, the evidence makes out a case of murder. *Williams* v. *State,* 130 *Ga.* 400, 403 (60 S. E. 1053); *Bowden* v. *State,* 126 *Ga.* 578 (55 S. E. 499).

The court did not err, therefore, in failing to charge on the subject of justifiable homicide. He had correctly instructed the jury as to the law of murder, malice, burden of proof, and of principals in the first and second degrees. He instructed the jury that before the defendant could be convicted of murder, they "must find from the evidence, beyond a reasonable doubt, that John Daniel was guilty of the crime of murder; . . that John Daniel wilfully and with malice aforethought, while endeavoring to kill and murder Doc Bell, killed Sallie Maud Bell." And also: "Before you would be authorized to convict Lou Miller, it must be shown to you beyond a reasonable doubt that John Daniel was guilty of murder in killing Sallie Maud Bell. It must be shown that he killed her, and that in killing her he was guilty of murder, under the evidence in this case. If that has not been shown, why you should acquit the defendant Lou Miller." This charge was as favorable to the defendant as he was entitled to, under the evidence. The court instructed the jury that there could be no conviction unless Daniel was guilty of murder. And there could be no murder if the homicide was justifiable.

Nor was the failure to charge on the subject of voluntary man-

slaughter error. This was a case of murder, or nothing. *Tolbirt* v. *State,* 119 *Ga.* 970 (47 S. E. 544). There was no such "hot blood," as contended by able counsel, as to authorize a charge on the law of voluntary manslaughter. After the first difficulty Daniel had deliberately armed himself with a deadly repeating rifle, procured through his companion, Miller, and had gone to the home of the prosecutor for the expressed purpose of killing him. There might be a question of voluntary manslaughter in this case if the circumstances of the first transaction were such that had death resulted to Doc Bell, as a result of that quarrel, it would have been voluntary manslaughter. See *Williams* v. *State,* 125 *Ga.* 302 (54 S. E. 108). ' But let us see how .the evidence stands as to that. Roy Johnson, who was in the buggy with Bell at the time of the first difficulty, and who was offered as a witness by the defendant, testified that Daniel said to the prosecutor that Hope Bell, a brother of the prosecutor, had wrecked his mother's home by running away and marrying her daughter, and he was going to kill Hope. Doc Bell then told Daniel that "somebody else could pull triggers." "Then John [Daniel] didn't say anything to Doc. He then shot at Doc without saying a word. Doc was in the buggy with me when John Daniel shot at him. We were twenty steps from John Daniel." There was nothing in this first transaction to authorize a charge on the law of voluntary manslaughter had death resulted. It is true that in the first transaction the prosecutor had fired one shot at Daniel, but it was only after Daniel had fired the third shot at *him.* In order to reduce the offense from murder to manslaughter, there must be some assault by the person killed upon the person killing, or other equivalent circumstances. *Ray* v. *State,* 15 *Ga.* 223 (5). There was no assault made by Doc Bell in this transaction on John Daniel. The cases cited by the plaintiff in error show an assault by the deceased upon the person killing. But if there was no voluntary manslaughter in the first transaction had death resulted, there is certainly none in the second, under the evidence. If Daniel had killed Bell during the first quarrel, he would have been guilty of murder. He made the first assault, and Bell only fired later when Daniel had fired the third shot at him. Daniel made no retreat, and without any apparent reason or justification pulled his pistol and commenced to fire at Bell. Had death resulted to Bell, can there be a question that he

would have been guilty of murder? This case does not, therefore, fall within the ruling made in the *Williams* case, supra, and the court properly failed to instruct the jury on the law of manslaughter.

The verdict is supported by the evidence.

*Judgment affirmed. All the Justices concur, except*

BECK, J., dissenting. It appears from the evidence of a witness introduced by the State, that Daniel, who was indicted as a co-principal with the defendant, without provocation except words, shot at one Doc Bell with a pistol. Bell, being unarmed, left at once and went to his brother's house, procured a gun, and returned. to the place at which his assailant, Daniel, had remained. As Bell was approaching with the deadly weapon in his hands, Daniel fired again. Under these facts the jury would have been authorized to find, that, after the first assault had been completed, Bell left the place, went a short distance from there, armed himself with a gun, and returned to where Daniel had remained, with intention to engage in deadly conflict with him; and further, that Daniel remained and awaited Bell's return and fired upon Bell as he approached, and that Bell, availing himself of the preparation which he had made when he went to his brother's house after the combat, answered the fire, and that this constituted mutual combat between the parties; and that the killing of either by the other under these circumstances would have been a felonious killing of the grade of voluntary manslaughter. If we are right in this, then it was a question for the jury to decide as to whether or not there had been sufficient cooling time between the time of mutual combat and the time of the fatal shooting, and consequently as to whether in firing the shot that resulted in the death of the decedent the principal in the first degree acted under the passion aroused by the mutual combat, or acted in malice or a spirit of revenge. In the one case he would have been guilty of murder; in the other, of voluntary manslaughter. But whether it was murder or voluntary manslaughter was a question for the jury to decide. And if they had found that the principal in the first degree was guilty of voluntary manslaughter, then it became a question for them to decide whether Miller, alleged to be the principal in the second degree, was also guilty of that offense. Thus the question as to whether the defendant was guilty of the offense of voluntary manslaughter was

one for determination by the jury, and the court should have given them appropriate instructions relative to that grade of homicide; and failure to give such instructions was error which should be corrected by the grant of a new trial.