HILL *v.* THE STATE.

No. 7270. NOVEMBER 16, 1929.

*George B. Rush, H. A. Allen,* and *John F. Echols,* for plaintiff in error.

*George M. Napier, attorney-general, John A. Boykin, solicitor-general, T. R. Gress, assistant attorney-general, J. W. LeCraw,* and *J. H. Hudson,* contra.

BECK, P. J. Harrison Hill was indicted for the offense of murder. Upon the trial of his case the jury returned a verdict of guilty, with a recommendation. It is charged in the indictment that the defendant did kill and murder one Emma Hill by shooting her with a pistol. The deceased was the wife of the accused. The defendant filed his motion for a new trial on the usual general

grounds, and this motion was subsequently amended. After a hearing the court overruled the motion.

■ The defendant contended, on the trial, that the shot fired by him which resulted in the death of his wife was discharged accidentally, and that he did not know that he had inflicted the wound from which she died until afterwards, when information came to him that his wife had been wounded and was confined in a hospital. The evidence was circumstantial, and the defendant insists that it is not sufficient to exclude every reasonable hypothesis other than that of his guilt. The general grounds of the motion are urged, and counsel insists in his argument that the judgment refusing a new trial should be reversed because of the insufficiency of the evidence. But after an examination of the evidence contained in the record, this court is of the opinion that it was sufficient to authorize the jury to return a verdict of guilty. The date of the alleged homicide was January 19, 1929. A witness for the State testified, in part, that she came out on the street, from her house and met the defendant, and he said: "I will kill any son of a bitch that messes with me when I am putting up for them. . . I didn't see anything in his hand. I didn't know at that time about anything having happened. I was going to the store. When this happened Harrison Hill and his wife were living down on Martin Street, next house to the store. When he made this statement I went on down the street to the corner, and he turned around and came behind me and said: 'Listen, Maggie, I shot my old lady, and she went in that store.' This was on Saturday night in January, this year. But he came on behind me, and he says, 'Listen, Maggie, I shot my old lady, and she went in that store. I don't think there was anything but a little scrape, a little burn; but you go in there and see, and come back and let me know.' I went in the store, and she [the deceased] was sitting up in bed. I asked her was she shot, and she said, 'Yes.' I asked her where, and she said, 'Through the back.' I asked her did she want me to call a doctor, and she said. 'No.' And he [the defendant] was there across the street where she could see him, and I goes to the door and tells him what she said. This was in Cohen's store. He [defendant] didn't say anything. And some men standing there says [to him], 'You go away,' and I told her he was gone, and she got up, and I helped her to the door and got her across the

street. . . I asked her where she was shot, and she said through the back, and she said she was scared to come out because he still had the pistol; and when I told him what she said, he didn't say anything; and the men out there told him to go away. Emma Hill was taken to the hospital after that."

Lizzie Jones, another witness for the State, testified, in part, as follows: "In January of this year I lived at 347 Martin Street. I knew the defendant and his wife, Emma Hill. I lived next door to her. I remember the time it was said Emma Hill got shot. I was at home the night of the shooting. I heard her scream some three or four times, 'Please don't do that,' but I didn't know what they were doing, because I wasn't in the house. I was in my own house; but I heard her three or four times during the night scream, 'Please don't do that.' That happened about eight o'clock at night. After the screaming was the shot. After this I heard her holloaing, 'Please, somebody go get an ambulance,' and by that time I broke to the front door and seen her going towards the corner, and he went after her and crossed to the next corner." Cross-examination: "Yes, sir, I went out of my kitchen into the middle room and looked at the clock to see what time it was, and it was eight o'clock. Emma Hill said, 'Lord have mercy; somebody call the ambulance.' When she was doing the screaming I don't know what she said; I wasn't there; but I heard her say, 'Lord have mercy. Somebody call the ambulance.' That's all. She said, 'Lord have mercy.' She called his name, 'Please don't do that.' . . I told them at police court she called his name. She called him Possum. 'Please don't do that, Possum.' I know she called him Possum because I heard her. That was the nickname she called him at home. I know she was talking to him [accused], because there was no man there but him. I didn't see anybody else there or hear anybody else there but Harrison and his wife."

Taking all these facts and circumstances,—the fact that the woman was fatally shot by her husband, that she was begging him not to "do that," his coming out into the street and stating to one of the witnesses that he had shot his "old lady," that the deceased, while in the store a little after the shooting, was afraid to go out as long as her husband was standing on the outside, and considering the further fact that the defendant denied that he knew that his wife was wounded until he was afterwards told, and other evidence

that was submitted as to the relations between the husband and wife, it can not be said that there was not sufficient evidence to authorize the verdict of guilty.

In the first special ground of the motion for a new trial error is assigned upon the ruling of the court admitting the following evidence of a witness for the State: "The wife of the defendant was my daughter. I knew of a difficulty between Harrison and his wife before this shooting occurred. She came over to my house, moved away from Harrison, I suppose a month or two before she was killed. I moved her back to my house. I talked with Harrison after I moved Emma back to my house. He came in and commenced to make apologies. She said he snapped the pistol in her face, and she said the pistol wouldn't go off, and he said, 'Who took the bullets out of this pistol?' and she said, 'I did.' And as quick as she said that he struck her over the head with the pistol. I saw the gash in her head. He came over there to get her to come back; said he would never do it again; said if he did he hoped somebody would take a knife and cut his throat. After that Emma moved back with him. That was about a month or two before she was shot. No, sir, this occurrence I am talking about did not happen two years ago. I did not prevail on Harrison to stay all night. I don't know anything about any such occurrence two years ago. As to why I know it was only two months before, I have some knowledge of time, like anybody else. I think it was the month of May, 1927, she came out there. I won't be positive it was 1927." The evidence quoted does not make it very clear when the event took place to which the testimony relates. From one part of the evidence it would seem that the witness was testifying positively that the event related by him occurred a month or two before the homicide; but in the latter part, after stating again that "it was only two months before," the witness stated, "I think it was the month of May, 1927, she came out there. I won't be positive it was 1927." Again, he testified: "After this second time she went back to him she didn't move back to my house any more. I discussed with Harrison lots of times the complaints his wife made to me. Emma was always coming with complaints. I guess I hadn't talked with Harrison in two months before she was shot, but I did talk with him within two months." On cross-examination the witness continued: "Yes, sir, the last time I talked with Harrison about these

things was when he came out there to get Emma and take her back home. No, sir, May, 1927, was not the last time I talked with him. I talked with him at that time, and then I had another talk with him after that. I don't know how long after, but whenever we would meet we would talk. I was building out there on the corner, and I would catch him down home occasionally. He would come over there. He has a weakness, he says, he couldn't help. He would just take a pistol and shoot up in the ceiling or around the floor and around the house any time. No, sir, I never did see him shoot any; he wouldn't shoot when I was there. Yes, sir, he has shot holes in the wall. You can go there now and see them, where they used to live. You can see three now. That has been two or three months ago, I reckon. Yes, sir, I expect he stayed there where he is for years."

There is evidently some confusion as to date. But considering the entire evidence, it was proper to admit the evidence, especially as the court afterwards instructed the jury that they should not consider "the evidence of that occurrence 18 months before the shooting at all, in connection with this case, unless the evidence shows some connection and some other acts down to and including a reasonable period of time before the shooting. If the evidence shows a continuation of this act, or similar acts, down to a period within a reasonable distance of the shooting, then you would consider them; but if the evidence does not show anything between the act of 18 months before and the shooting, then you will disregard that act that was testified to as having taken place about 18 months before the shooting."

■ The court did not err in giving the charge wherein the jury were instructed, in substance, that it was a question for them to "say whether or not certain evidence was connected up." This issue was properly submitted to the jury; and it was not, as contended in the assignment of error, a question "solely within the province of the court."

■ ■ The rulings in the headnotes 4 and 5 require no elaboration.     *Judgment affirmed.*     *All the Justices concur.*