1. It is not error to fail to instruct the jury on the law of justifiable homicide where there is no evidence that the killing was justified. Miller v. State, 139 Ga. 716 (4) (78 S.E. 181); Benjamin v. State, 150 Ga. 78 (2) (102 S.E. 427).
2. In the instant case there was no evidence to show that the alleged homicide was justifiable either under the doctrine of reasonable fears or under the rule as to self-defense; and consequently the judge did not err in failing to charge upon the law of justifiable homicide as related to either theory.
(a) The extrajudicial statements declared by witnesses to have been made by the accused did not exculpate him, as contended.
(b) His statement to one of the witnesses "that he was protecting himself" was a mere conclusion, and, being contradicted by the statements of fact made by him in the same connection, did not show justification. Sweat v. State, 107 Ga. 712 (33 S.E. 422); Ogletree v. State, 115 Ga. 835
(42 S.E. 255).
3. Nor was there anything in the defendant's statement to the jury to show justifiable homicide, as insisted in the motion for new trial. Moreover, the omission, without request, to charge the jury on a theory which finds support only in the prisoner's statement at the trial is not erroneous. Felder
v. State, 149 Ga. 538 (101 S.E. 179); Hill v. State, 169 Ga. 455 (5) (150 S.E. 587); McLendon v. State, 172 Ga. 267 (2) (157 S.E. 475).
4. The evidence authorized the verdict, and the court did not err in refusing a new trial.
Judgment affirmed. All the Justicesconcur.
 No. 13126. MAY 23, 1940.
Ernest Turner was convicted of the offense of murder in the alleged killing of Jesse Leggett, and was sentenced to life imprisonment in accordance with recommendation of the jury. The indictment alleged that the killing occurred on December 4, 1938, and that it was done with a knife and another sharp instrument unknown to the grand jury. The defendant filed a motion for new trial upon the general grounds, to which by amendment three other grounds were later added, one of which was a mere amplification of the general grounds. The other two special grounds complain of *Page 317 
the failure of the judge to charge (1) the law of justifiable homicide based upon reasonable fears, and (2) the law of justifiable homicide as related to the killing of a human being in self-defense as against one who manifestly intends or endeavors by violence or surprise to commit a felony on the person killing. The judge overruled the motion, and the defendant excepted.
It appeared from the evidence that the defendant cut or stabbed the deceased, late in the night at or near a vacant house on a farm in Macon County, where these two, with others, spent the greater portion of the night, either in gambling with cards or in taking shelter from a continuous rain, or both, the evidence being in conflict as to whether there was gambling. Isaiah Hayes, sworn for the State, testified in part as follows: "I saw Jesse Leggett before I went to that house that night; he and Ernest Turner came to my house that night, and after they came to my house he went over to Jab's (I mean James Turner), and after that we left there and went to this house; we had started to a play; it commenced raining, and we went to that house. I did not see Ernest Turner do anything in the house. I saw him go out of the house, and after that Jesse Leggett left out, and sometime after Jab Turner left out. After Jesse Leggett walked out of the house he walked in and fell up against the door, and says `Look, Ernest has done cut me;' he fell right there in the door, and we picked him up and looked at him and started to carry him to his home and saw he could not make it, and two of us boys carried him to the forks and laid him down on the road. He came in the house and fell. . . I saw Jesse Leggett go out of that house; he did not have anything in his hands that I saw. I was looking at him; they had no discussion between the two of them that I know of before they went out. I don't know exactly, but they were not gone very long before the man returned. I would take it to be about four or five minutes, and he came back and fell. . . If the time just passed by your watch is half a minute, I would say that he was gone about half a minute. His shoulder was wet with blood when he came back there in the house. I did not look at the wound, did not care to look at it. This defendant, Ernest Turner, never did come in there when Jesse came back in there and fell; he went out there somewhere in the yard after the cutting; he went out before the cutting, and then Jesse came back and was cut. I saw *Page 318 
Ernest directly after the cutting; he came back where Jesse was laying out there in the road where we had picked him up and toted him. At the time this defendant, Ernest Turner, came back to where the body was lying in the road there was several of us there with Jesse Leggett; not right there with him. I was there. When this boy came back to the body he struck a match and turned him over and looked at him, and he says, "This here is Jesse. I got you. I did not like you no how.' At the time he was making this statement Jesse could not do nothing; he was not doing anything, no more than lying there. Jesse Leggett is dead. At the time he turned Jesse over and says "This is Jesse, I did not like you no how,' Ernest used the word damn; he says, "This is Jesse. I did not like you worth a God damn no how.' Jesse is dead. I don't know how long he lived after he was stabbed. I don't know whether he died that night or a little before day. I saw his body that morning, and he was dead."
Reed Hicks testified that Jesse Leggett was a son of his wife, that he (witness) was at home that night until he learned of the trouble, and that he then "went and picked Jesse up." He further testified: "I got over there that Sunday morning, and Jesse Leggett was laying about fifteen feet from the doorstep, flat on his back with his head lying in the right-hand rut; it was about four o'clock Sunday morning. We just picked him up. I reckon he was bloody; there was a little hill like there was just running from him a little sprinkle of rain and blood running down, looked to me like twelve or fifteen feet; it was raining a steady rain, and we carried him home, and you could wring blood out of his clothes. I took him home and washed him and put him in the bed. I carried him to his home. I don't know how long he lived; he was dying when I left and started for the doctor, but it was not over an hour. He was dead before five o'clock that Sunday morning. After I went and got Dr. Derrick and went back home he was dead. I hired George Mumford to go for the doctor in a car with me; while we were in that automobile we met Ernest Turner, this defendant, with his shotgun; he waved that shotgun and said, `Stop the damn car,' and we stopped the car, and he walked around on the right side on the left of the driver and says `You got the damn law,' and I says, `No, Ernest, I am going to the doctor,' and he says `Well, I have got in trouble the balance of my days,' and says, *Page 319 
`We were gambling, and I won the biggest of the money and done all the treating of the whisky, and some one hollered in the house, "Yonder comes the law," and one of the Mumford boys put the fire out, and he ran out, and Jesse run against him, which he ought not to have done, and I struck him, and says, I had to strike somebody.' He did not say what he struck him with; he asked George, `Where is Jesse?' and he says, `At home,' and he says, `Is he dead,' and George says, `No, but looks like he is getting pretty close,' and he says, `I am already in trouble, and don't give a God damn about Mr. Wilburn or Mr. Fowler or anybody, and I about as well go ahead and finish him and go on to the electric chair; you all drive off,' and we went on away from there." Cross-examination: "I know nothing about a gambling game going on that night, no more than what Ernest said. It was just a steady rain, just enough to wet the ground; you could see water running on the roadside; it rained more than enough to settle the dust, I could see the blood when I got there. I never did go back."
Dr. H. C. Derrick testified that he was called on the same night to the home of Reed Hicks, for the purpose of examining Jesse Leggett. He described the wound as follows: "I found a stab on the left shoulder in the front part of the shoulder, and it was about an inch and a half long, and I don't know how deep; something like about four inches; the artery that supplies the arm or the arbrachial artery was severed, absolutely cut in two; he bled to death and he was dead; he bled to death from that wound; it looked to me like every bit of the blood was out of him when I arrived there, and he was dead at the time. One eighth of a body weight is blood. It looked like a wound I have described was mad with a butcher-knife; from the appearance of that wound it was made with a very sharp instrument, and looked like after he got it in there he gave it a kind of cut like that." On cross-examination the witness testified: "He [Jesse Leggett] was dead when I got there. I could not have saved his life by stopping the blood if I had gotten to him immediately after he was cut; if I had been right on the scene, in probably ten or fifteen minutes I probably could have, could stop most any artery if you can get to them." Dr. Derrick testified, as to a conversation with the defendant on the occasion of his visit to the deceased, as follows: "I saw the defendant Ernest Turner early the next morning or that night; he showed me the knife he cut *Page 320 
Jesse Leggett with. I heard him make a statement which was freely and voluntarily made. I offered him no reward or inducement in the world to make that statement. . . He just told me, `I was backing Jesse up in a game, and they put out the light and said the law is coming,' and he said he ran out of the room; just as soon as he hit the ground he kind of stumbled, and by the time he stumbled and got back on his feet somebody ran out there on him, and he had this knife and he hit at him and hit him and felt it give way, and he ran out across down the road a little bit and out into the cottonpatch; he displayed the knife. I asked him what knife he used, and he said, `a switch-blade pocket-knife,' and he produced the knife and showed it to me; he said he felt it give way when he hit him with the knife. He was talking about the fellow that ran out on him; he did not know what it was. Ernest Turner said he was coming out of the door when they put out the light, and kind of stumbled, and by the time he got back on his feet this fellow came out of the door the same time and ran up against him, and when he did he said he struck him; that is the time he hit Leggett; it was a long knife; that is the knife or looks very much like the knife he showed me that morning the same time he made this statement to me; he said that is the knife he cut the fellow that ran out on him with, and said he did not know it was Jesse Leggett, did not know who it was, but somebody ran out on him and give him all; that blade is about four or four and a half inches long; that is a keen, sharp blade; that looks like it might be rust on that knife; you can't detect blood on that blade with the natural eye; when blood gets old it looks like rust; that looks very much like the knife." Cross-examination: "I saw Ernest Turner that same morning just about day, Sunday morning; he asked me to let him come to town; he wanted to go to the sheriff. He was there at Jesse Leggett's; he said he would not have done it for anything, he did not know it was Jesse, and if he had known it had been Jesse he would not have done it for anything in the world, that Jesse was a good friend of his, and that he would not have done it, but he said he ran out there on him and he was protecting himself. He was right in front of Jesse's house when I got there that morning. . . I saw Ernest again when I walked out of the house; as well as I remember, he said, `Are you going back home?' and I says `Yes,' and he says, `How about carrying me by Mr. Fowler's and tell him I *Page 321 
want to go down and give up to Mr. Jolly. I want protection from these people out here,' or something to that effect; and I carried him by Mr. Clovis Fowler's, who is overseer, and we stopped there; he said he told Mr. Fowler where he was going, and Mr. Fowler says, `Well, I think it would be easier on you.'"
W. T. Jolly, sheriff, testified as follows: "I heard him [the defendant] make a statement freely and voluntarily about the death of Jesse Leggett. I threatened him in no way, offered him no inducement nor put him in the remotest fear of injury; he said they were out in this vacant house and somebody says, `Here comes the law,' and he went outside, and this Leggett boy came out behind him and rubbed up against him and struck him with the knife. He did not say the Leggett boy did anything but butt against him; he made no claim he had a knife or any weapon. Mr. Clovis Fowler gave that knife to me. I showed it to the defendant, and he said that was the knife he used to cut Jesse Leggett; he went back home after the cutting, but did not say he got a shotgun. I asked him why did he get the shotgun and go towards Jesse Leggett's house, and he said he did not do it; he finally said he did not remember whether he had a gun or not. He was drinking. I smelled liquor on him pretty strong." Cross-examination: "He surrendered to me voluntarily, came with Dr. Derrick. . ." Redirect examination: "The defendant stated that the cutting took place at the door of the house on the steps, something like that. . ."
The defendant made a lengthy statement, in part as follows: "Me and Isaah and his brother Buddy went to this house and built the fire, and after something about thirty minutes Buddy Carr, Brother Mumford, and them came in; when they came in we were dealing the cards; we had been skinning all the time when they got there. Jesse came in and said he did not know how far down the dealing is or nothing; he held the cards. Isaah stopped and Jesse picked the cards off the board, and when he picked the cards off the board he says, `A dime to you;' I bet him, and Isaah bet him; and when we bet him, the second card he turned it over, and when he turned it over he says, `Ernest, God damn you, you have been trying to beat me out of my money all night,' and I says `No, I have not, Isaah is dealing, I am not the man dealing,' and he says, `You are a God-damn lie; you have been messing with me all night; you don't believe I will kill you, do you?' and I says, `Yes, I believe it.' *Page 322 
I says, `Here is your dime back. I had rather give it to you than have you think I beat you out of your money. I am not going to bet you any more to-night,' and he says, `Yes, you are going to bet me or have to go to hell,' and I says, `I will have to go to hell; I ain't going to bet you,' and the next cards he pulled out a half dollar and says a quarter too, and I picked the half dollar up and says, `Here, take it back; you have not bet in this game; you take your half dollar back; I ain't going to bet you any more to-night;' and Buddy Hayes borrowed seventy-five cents from me, says, `I will bet him,' and I give him three quarters on his jumper, and Jesse said it was his jumper, and I reached to get the jumper; they had broke the game all except seventy-five cents, and I let the boy have it when we got in dispute about the jumper. Buddy had pawned it to me, but Jesse said it was his. My coat was lying down by the side of me, and my hat too; and when I reached to get it they all jumped up that way, and I jumped up too, and when I jumped up the fire went out, and I was next to the door and made for the door, and Jesse right behind me says `God damn you, you have been messing with me all night,' and I did not stop, and when I run down the doorsteps I opened my knife, and he whirled right into me. I did not turn at all. I did not go down there at all; went down to Jesse Maddox and went on home. About the gun proposition, that morning after it had come day, my house and Uncle Reed's house I don't suppose is a hundred yards apart; they are right close together. I was wanting to get out from there because I was afraid of old man Reed and wanted to get out from there, and I taken my gun and told my wife to come on and go with me as far as the woods, `You bring the gun back. I am going down yonder and hide out. I am scared to stay here. I don't know when Mr. Jolly will come for me. I am scared to stay up here.' So far as trying to bother or anything else, no sir, I did not have nothing like that on my mind. I ask the court to have mercy on me."
The judge charged the jury on murder, voluntary manslaughter, presumption of innocence, burden of proof in criminal cases, right of the defendant to make a statement, and other incidental subjects. As alleged in the motion for new trial, he did not charge on justifiable homicide as related to reasonable fears, or as related to self-defense as against the commission of a felony upon the person killing. *Page 323