1. The evidence sustains the verdict under the general grounds.
2. It is the general rule that where testimony sought to be introduced shows that it was not a part of the res gestae and was not in rebuttal to testimony offered by the State, it is not error for the court to disallow such testimony for the reason set out in the opinion.
3. The defendant is not entitled to have a charge made in an argumentative from by selecting facts emphasizing the defendant's interest, or where the general charge is full and clear and involves all the issues under the evidence.
4. The assignments of error on refusal of the court to charge as complained of in special grounds 4, 5, and 6, show no reversible error.
 DECIDED MAY 29, 1947.
The defendant was convicted of assault with intent to murder. The indictment charged the accused with throwing and scattering upon the body of Jim Robinson an alkaline material composed of lye or potash and hot water, maliciously and with intent to kill him. An amended motion for a new trial was filed and overruled. On this judgment error is assigned.
In view of the earnest insistence upon the grounds of the motion for a new trial as amended, we deem we can discuss with more clarity the assignments of error by setting out to some degree of elaboration the evidence.
Jim Robinson, sworn for the State, testified: "On the 11th day of August, 1946, I was a well, healthy man; on the night of August 11th, this year, I was married to or living with Lorene Robinson, the defendant, as my wife; I went to bed that night in the house where Lorene and I were living; that house is in Macon County, Georgia; something happened to me while I was asleep *Page 247 
in my bed in my house that night; I was on the far side of the bed and she was on the other side, and she threw the potash on me while I was asleep, and I rolled on the floor and it seemed like something rolled on that arm and then she threw some more on me; when she threw that on me she says, `this is two men, this ain't me' and I says, `I know it is you, old lady, . . I was asleep when the stuff hit me; it woke me up when it hit me; I was in the bed when I woke up; some more hit me one time after I woke up; it just seemed like hot boiling potash water to me; I was asleep at the time that stuff woke me up and hit me; when I went to bed that night Lorene lay down by me in the bed; when I woke up I found that stuff on me; it set me afire; it hurt a heap; hurt me so I hollered and people heard me in town and everywhere else; I live, I believe, about two miles from town; I am not quite over it yet; I was due to the doctor today in Macon; some of that material that was thrown on me got in my eyes; one eye is done plumb out now, and one I can discern a little bit and some days I can't see with it; I can't see from here to you; I just can discern you there a little bit; before that stuff hit my eyes I could see everywhere I tried to look; it hit in my face; it burned my face bad just like somebody done cut it up; the inside of my mouth was the same way, turned wrong side out; I can't see out of that eye; the potash kept my lips chipped up together; the condition of my lips today is the result of that material thrown on me in August of this year; it got on my head; all my hair was off but just a little bit, and it came back; before I went to bed that night all my hair was on my head; the potash went down in that right ear and back to my head and I could not hardly rest until I went to Macon to the doctor, and he bored a hole into my head and that is where he doctered on my head every time I go there; I had nothing wrong with the ear until that stuff was thrown on me that night; potash and stuff ran down my nose and eyes and just smells now; it burned a heap; I got some in my mouth; I got some burns on my arms down here; that is where it hit me down there on the stomach down below my navel; potash did that on my left breast and right shoulder; those are injuries I got when that stuff was thrown on me that night; potash caused those wounds that same night on the right of my neck; potash caused the wounds from the wound on the back of my neck and going way down here; *Page 248 
potash caused that in the arm in the back with the sore on my left arm extending over there practically to the right arm; potash caused those sores and injuries under my left arm pit; that was not all right before that night; it was done that night . . it hurts me now sometimes; all of this I have testified to happened in Macon County, Georgia."
On cross-examination the same witness, after having stated that he was not lawfully married to the accused, but living with her, testified that he had a 16 gauge shotgun, that the gun was usually kept on the rack a "good piece" from the bed of witness, in a room about 10 feet wide, at the home of the witness; that the bed was in the back side of the room and the gun was near the fireplace; that the gun was a 16 gauge gun; that he could get no shells for it; that he had only one shell in the gun and that was a 20 gauge shell and he put a 16 gauge hull over it and could not get it out, and did not try to get it out; that on Sunday afternoon, at the request of the accused, witness went to town and brought back with him a watermelon which he cut and was eating. He inquired of the accused "did that boy send that pump back here?" Accused replied, "He brought it back himself and let the children take it and carry it in the house." The witness upbraided the accused for allowing the man to visit the home while the witness was away. The accused stated that the man did not come in the house. Witness said to her: "It is all over with us, old lady. . . I don't mean no harm because I will tell him about it myself." The witness denied beating the accused with a belt or his hand; denied mentioning threatening the accused with a gun. Previous to that Sunday, at the instance of the accused, witness purchased a can of potash for her. The accused told witness that she purchased one also. The witness then went into reiteration and enlargement of the gruesome effects of the potash in his eyes, nose, throat, ears, and other portions of his body.
Dr. Seay testified as to the treatment he administered to Jim Robinson and the extent of his injuries. The record shows that the vision of one eye was completely gone at the time of the trial, and the vision in the other was very indistinct. He testified that the extent of Jim Robinson's injuries was caused by the throwing of a mixture of potash and hot water in his face, nostrils, ears and on other portions of his body. He stated that the water in *Page 249 
which the lye or potash was mixed was hot enough to burn a person, within itself, and that the potash was more caustic when mixed with hot water. He stated that when he saw Robinson that night for the first time he considered that Robinson had a 50-50 chance of recovery; that he applied the best known treatment to allay the effects of the potash and sent Robinson to the hospital; that the object of the treatment was to keep Robinson from dying; that the mixture was concentrated. On cross-examination the same witness testified that Robinson's blood pressure remained within the normal limit; that the patient was in pretty fair physical condition; that very little inflammation set in; that the falling of the blood pressure is a bad sign in a case of that kind; that there are three ways to die of burns: First, by shock or loss of blood serum at the time of the burn or shortly thereafter; second, from infection; third, from restriction of the esophagus. In this case the witness stated that Robinson lost no blood, developed no anemia; that his temperature developed no serious rise; "I could not say that Jim did not come any way close to dying; his heart reacted normally, but he could have, if he had not been treated, very probably developed very serious burns. We have to think of what could have happened; he did not die, — he did not come near dying."
The sheriff, sworn for the State, testified that he visited the scene on the night of the incident in question. He saw the bed which was covered with some slimy substance that smelled like potash to him; that the wall was discolored and the floor was discolored and covered with it on the left side of the bed; that the accused stated to the sheriff that she and Robinson were sleeping in the bed and that somebody had broken in the house and poured potash water on him and her. (There seems to be no evidence that she was burned). Later, without any threat and without any hope of reward, or the remotest fear of injury, the accused freely and voluntarily stated that Robinson and the accused had gone to bed and when she heard Robinson snoring and when she knew he was asleep, she arose, lit the oil stove, boiled the water, put the potash in a gallon can, poured the boiling water on it, and poured the mixture on Robinson in the bed while he was asleep. The sheriff procured the can which the accused used and had it in court. It had potash lye on it. The can was found empty outside the window of the kitchen. The accused stated to the sheriff *Page 250 
that she had asked Robinson to bring some potash, telling Robinson that she wanted it to use to wash the bed mattress, and to scour with, but she stated to the sheriff that that was not the purpose for desiring the potash; that she had been planning to pour potash on Robinson for three weeks; she did not tell Robinson what she wanted with the potash, but she had been trying to get him to bring it for three weeks.
On cross-examination the sheriff stated substantially that Mr. Middleton, the policeman, was there with him; that the accused stated that she bought the potash on Saturday, the day before she threw it on Robinson. The policeman asked her why she did not use a gun instead of pouring the potash on Robinson, and in response the accused stated that she did not want to use a gun; that she wanted him to suffer like she had had to suffer. "She did not want to kill him right off the bat." Witness testified further that the accused stated that Robinson was mean to her; had whipped her several times. She did not give the number of times. The sheriff did not recall whether he brought a shotgun shell from the home of Robinson or not; that since no gun was brought into question that night, he did not think of it seriously; that his best recollection was that he did not bring a shell. The sheriff found a shotgun on the rack between six and seven feet on the wall. The accused did not tell the sheriff anything about Robinson threatening her with a shotgun or that he was going to kill her or anything, and the witness had no reason to even bother the shotgun. The sheriff stated that he went into further details with the accused as to why she threw the potash on Robinson and in response the accused stated that Robinson was mean to her, would not let her go to church or to see her mother, and that he whipped her that afternoon and that when Robinson went to bed and to sleep she got up and fixed the potash and put it on him. Robinson weighs about 160 to 170 pounds, and the accused 115 to 120 pounds. No test was made to show the strength of the potash solution.
The defendant's statement follows: "White people, he beat me lots of times, and beat me all that Sunday and that night and so he kept on beating me and so he went to bed; he had fussed at me and said he was going to kill me Monday morning, and Monday morning said I would be asleep in hell; said he would *Page 251 
kill me with the shotgun, and he kept jumping on me and I just threw a little potash on him so he would quit beating me so much; he beat me lots of times; he beat my two little boys, my children out there; he beat them with a stick, John Stancil and Willie James; he beat me lots of times, any time; I have been living with him five years; he has been good to me and then changed up and anybody tell me good morning he would jump on me and beat me; he did not want anybody to talk to me; that night he just kept on beating me; that day he beat me until he went to bed; he said I would be sleeping in hell Monday morning; he was going to kill me with a shotgun; he had a shotgun there; he did have it by the side of the bed and I took it and hung it up."
The defendant introduced several witness as to the bad general reputation of Robinson and they testified that they would not believe him on oath. Several other witness were introduced on behalf of the accused to the effect that she was not normal mentally and that at times she did not know the difference between right and wrong.
In addition to the general grounds, there are six special grounds.
1. The court fully charged the law of assault with intent to murder, particularly with reference to malice, express or implied, and specially with reference to a deadly weapon in the manner used and that the assault with such weapon must be with the specific intent to kill. The court also charged clearly the law of confession, and the law with reference to the mentality of the accused. The court charged that before the jury would be authorized to find the defendant guilty they must believe her guilty beyond a reasonable doubt. The court also charged that in the event the jury found the defendant guilty they had the authority to recommend a misdemeanor punishment. The court also charged the law with reference to the lesser offense embraced in the bill of indictment, that is, assault and battery. The court charged fully as to the defendant's statement and finally that if the jury had a reasonable doubt as to whether or not the State had carried the burden of proving that the defendant was guilty of either assault with intent to murder or assault and battery, they should acquit her. So far as the general grounds are concerned, the evidence *Page 252 
sustains the verdict. The court committed no error in its charge. See Tatum v. State, 59 Ga. 638.
2. Special ground 1 assigns error because the court refused to allow testimony, over objection, that the accused, after the assault on the victim, flagged a passing automobile for the purpose of having the victim carried to a physician for medical attention. It does not appear how long a time elapsed after the alleged act of throwing the potash before the automobile was flagged, therefore it does not appear that the testimony complained of was a part of the res gestae. On this theory the evidence was not admissible under the Code, § 38-305. The evidence objected to was not admissible to rebut any evidence which had been introduced by the State. We think it clear that the evidence sought to be elicited and introduced was purely self-serving and inadmissible. Hart v. State, 14 Ga. App. 364
(3) (80 S.E. 909); Slappey v. State, 64 Ga. App. 714
(13 S.E.2d 873). The case of McCullough v. State, 11 Ga. App. 612
(3) (76 S.E. 393), relied upon by the defendant, under its peculiar facts, is not authority for varying the general rule which governs the instant case under its facts. Special ground 2 is abandoned.
3. Special ground 3 assigns error on the following charge of the court: "I charge you that the extent of injury inflicted by the defendant on the assaulted person does not necessarily determine the degree of crime. Serious injury may result from a lesser attempt and a lesser injury may result from a more serious attempt. If you should determine from the evidence that the defendant is guilty of assault and battery, the fact that the injured person may have suffered considerable pain and disfigurement would not raise the degree of crime above that of assault and battery."
In our opinion the general charge covered the principle of law which counsel for the plaintiff in error may have sought to invoke, but there are many imperfections which may be pointed out in the request to charge, some of the outstanding ones are: It was argumentative; it sought to have selected facts in behalf of the defendant's interest emphasized; it was inclined to have the court invade the province of the jury for it is a general principle of law that the jury may consider the extent of the wounds in determining the character of the weapon used. Bond v.State, 68 Ga. App. 15 (21 S.E.2d 866). The defendant is not entitled to *Page 253 
have a charge made in an argumentative form, by selecting facts emphasizing the defendant's interest, or where the general charge is full and clear and involves all the issues under the evidence.
4. Special ground 4 assigns error on the court's refusal to charge as follows: "I charge you that a person is not required by any law to leave her home to avoid being injured by any other person. If you believe that the defendant was convinced that felony would have been committed on her or that serious bodily harm would have been done her if she had not taken some steps to deter the one she feared, she would have been justified in using whatever force was necessary to protect herself before she would be required to leave her house alone in the night time." This request to charge is not adjusted to the facts of the case. In addition, it is argumentative. See, in this connection, Hill v.State, 64 Ga. 454 (2); Turner v. State, 190 Ga. 316
(9 S.E.2d, 270).
5. Special grounds 5 and 6: Special ground 5 assigns error to the effect that if death did not ensue by the use of a deadly weapon, in the manner in which it was used, that no presumption arose that the defendant intended to kill, but that the burden was upon the State to prove the intent to kill; and special ground 6 that where death does not ensue it was an issue to be decided by the jury as to whether the defendant intended to take human life or to inflict a lesser injury; and that the evidence can not be said to demand a verdict of guilty of assault with intent to murder even where no justification or mitigation appears. The general charge of the court fully covered the assignments of error in these two grounds.
The court did not err in overruling the motion for a new trial for any of the reasons assigned.
Judgment affirmed. MacIntyre, P. J., and Townsend, J.,concur.